IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

STEVEN C. HAYES                                                    PLAINTIFF

v.                        Civil No. 6:20-CV-06058-SOH-MEF

DR. THOMAS DANIEL,                                                 DEFENDANTS
DR. NANETTE VOWELL,
PHYSICIAN ASSISTANT SHARONDA S.
LONG,
DR. LARRY DAVIS, D.D.S,
DR. MADISON TALLIAFERRO, D.D.S.,
NURSE JASON M. KELLY,
DR. JEFFREY STIEVE,
OMBUDSMAN CHARLOTTE GARDNER,
STAN WOFFORD, SR. (Vice President of
Correct Care Solutions),
JORGE DOMINICIS (Executive of
CCS/WellPath),
GERARD "JERRY" BOYLE (Founder of
CCS),
NURSE PARSONS (WellPath),
MAIL ROOM SUPERVISOR SUE ALFORD
(Arkansas Division of Correction), and
CRYSTAL McCOY

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed under 42 U.S.C. § 1983. Pursuant to the provisions of 28

U.S.C. § 636(b)(1) and (3), the Honorable Susan O. Hickey, Chief United States District Judge,

referred this case to the undersigned for the purpose of making a Report and Recommendation.

Currently before the Court are Motions for Summary Judgment by Defendant Alford (ECF

No. 93) and the Medical Defendants (all remaining Defendants) (ECF No. 108).

## I.        BACKGROUND

Plaintiff filed his Complaint on June 9, 2020. (ECF No. 1). On June 10, 2020, the Court

entered an Order directing Plaintiff to file an Amended Complaint by July 1, 2020. (ECF No. 7).

When Plaintiff failed to submit an Amended Complaint, the Court entered a Show Cause Order. (ECF No. 8).  Plaintiff submitted his Amended Complaint on July 14, 2020, with no explanation for his failure to meet the initial deadline.  (ECF No. 9).  Plaintiff additionally filed a Motion for Preliminary Injunction the same day.  (ECF No. 10).

Plaintiff alleges that his federal constitutional rights have been violated by the Arkansas Division of Correction ("ADC") and their contracted healthcare provider Correct Care Solutions (now WellPath, L.L.C.) based on the denial of adequate medical care starting in 2014.  He alleged fourteen separate claims.[1]

On August 3, 2020, Plaintiff filed a Motion to Amend which asked to add the first name of Madison to Defendant Dr. Taliaferro's name.  (ECF No. 15).  This motion was granted on August 5, 2020.  (ECF No. 16).  Plaintiff filed another Motion to Amend on August 6, 2020.  (ECF No. 17).  With this motion, Plaintiff sought to add five additional Defendants and correct an address for a Defendant previously listed.  (*Id*.).  This Motion was denied on August 10, 2020, because Plaintiff failed to comply with the Local Rules of Civil Procedure and failed to provide any factual allegations to support the addition of these Defendants.  Plaintiff was also advised that it was not necessary to Amend his Complaint to correct an address, which, in this instance, was not in need of correction.  (ECF No. 18).

Pursuant to the preservice screening required under the Prison Litigation Reform Act ("PLRA"), the undersigned entered a Report and Recommendation on August 21, 2020.  (ECF No. 20).  It was recommended that any of Plaintiff's claims which were dated prior to June 9, 2017, be dismissed without prejudice because they were barred by the statute of limitations, but it

---

[1] These claims were described in detail in the PLRA preservice screening Report and Recommendation.  (ECF No. 20).  Because Plaintiff subsequently dropped a number of these claims in his Summary Judgment Response, only those remaining for the summary judgment motion will be listed later in this Report and Recommendation.

also noted that this did not eliminate any of his claims in their entirety. (*Id*. at 8-9). It was recommended that Plaintiff's official capacity claims against ADC employees Griffin, Gardner, Alford, and McCoy be dismissed without prejudice because these Defendants were state employees, and the claims were barred by sovereign immunity. (*Id*. at 9). It was recommended that Staff Psychiatrists Lee and Richard be terminated from the case as Defendants because Plaintiff had failed to allege any claims against them, instead only listing them as Defendants in the caption of the case. (*Id*. at 9-10). Finally, it was recommended that Plaintiff's claims against Defendants Griffin and McCoy regarding their handling of grievances be dismissed without prejudice, and that Defendant Griffin be terminated as a Defendant in the case. (*Id*. at 10-11).

Plaintiff filed his Objection to the Report and Recommendation on August 31, 2020. (ECF No. 21). On September 2, 2020, the Honorable Susan O. Hickey, Chief United States District Judge, adopted all recommendations except that regarding the statute of limitations. (ECF No. 22). Chief Judge Hickey noted Plaintiff's objection to the dismissal of his claims regarding Dr. Molden for the alleged failure to provide adequate treatment and medication for Plaintiff's psychiatric issues from December 2014 to the present. It was further noted that Plaintiff argued that Dr. Molden's care constituted a continuing violation, so the statute of limitations should not commence against Plaintiff's Molden claims until the last incident of inadequate psychiatric care from Molden concerning his insomnia, anxiety, and mental illnesses. (*Id*. at 3). Because the Eighth Circuit has not addressed the application of the continuing violation doctrine in this context, and because the case was at the initial stage without the development of a factual record, Chief Judge Hickey declined to adopt the portion of the Report and Recommendation "to the extent it recommends dismissal of any portion of Plaintiff's claims that occurred before June 9, 2017." (*Id*.

at 5). However, she "expressed no opinion at this time as to the validity or applicability of the continuing violation doctrine to this case." (*Id*. at 5, n. 3).

On October 13, 2020, Defendant Alford filed a Motion to Dismiss. (ECF No. 26). The next day, the Court entered an Order directing Plaintiff to submit his Response, and he did so on October 23, 2020, and by amendment on October 26, 2020. (ECF Nos. 31, 32). The Initial Scheduling Order for the case was entered on November 10, 2020. (ECF No. 38).

On December 15, 2020, Plaintiff filed a Motion to File a Second Amended Complaint, attaching a 229-page Proposed Amended Complaint, which was not submitted on the approved Complaint form for this District. (ECF No. 42). On December 17, 2020, Plaintiff filed a Motion to Withdraw his Motion for Preliminary Injunction. (ECF Nos. 43, 50). Plaintiff's Motion to Amend was granted on December 21, 2020.[2] (ECF No. 45). In the Order he was directed to submit his Second Amended Complaint using the Court approved form for the District and to limit his submission to an additional five pages of paper if needed. (*Id*.). He was also cautioned that he could not add back claims or Defendants which had been terminated earlier in the case pursuant to PLRA preserve screening. (*Id*.). On January 4, 2021, Plaintiff filed a Motion to Withdraw his Motion to File a Second Amended Complaint. (ECF No. 49). On January 14, 2021, the Court entered an Order granting Plaintiff's Motion to Withdraw his preliminary injunction filing. (ECF No. 50). On January 21, 2021, the Court entered an Order granting Plaintiff's Motion to Withdraw his Motion to File a Second Amended Complaint. (ECF No. 52). In the Order, Plaintiff was cautioned against any further attempts to circumvent the PLRA preserve screening Order entered on September 2, 2020. (*Id*. at 2).

---

[2] It appears that Defendant Alford's Motion to Dismiss (ECF No. 26) was terminated by the subsequent Order granting the Motion to Amend and was not reactivated.

On March 17, 2021, Plaintiff filed a Motion to Supplement his Amended Complaint. (ECF No. 66). With this motion, Plaintiff sought to add claims and Defendants to his case for alleged constitutional violations which occurred since he had filed this case. (*Id.* at 1). He also sought to add 59 pages of grievances which he stated were either exhausted, or filed and exhausted, since he had filed this case. (*Id.* at 3-4). This Motion was denied on April 12, 2021, because it was untimely (filed more than a month past the scheduling order deadline to do so), and because Plaintiff failed to provide any argument to support good cause for his delay in attempting to add these claims and parties. (ECF No. 71 at 1-2). Plaintiff was advised that, to the extent he wished to use the 59 pages of grievances to support the existing claims in his case, he could submit them with his response to any summary judgment motion that may be filed by the Defendants. (*Id.* at 2).

Plaintiff filed a Motion to Reconsider on May 3, 2021. (ECF No. 74). The undersigned entered a Report and Recommendation regarding this motion on June 21, 2021. (ECF No. 82). It was recommended that Plaintiff's Motion to Reconsider be denied because "Plaintiff does not set forth any manifest errors of law or fact, present any newly discovered evidence, or demonstrate exceptional circumstances as required by Rules 59(e) and 60(b). Instead, he repeats the arguments presented in his initial Motion to Supplement ...." (*Id.* at 2). Plaintiff filed his Objection on July 2, 2021. (ECF No. 84). Chief Judge Hickey adopted the Report and Recommendation and denied Plaintiff's Motion to Supplement on August 2, 2021. (ECF No. 86).

While the Report and Recommendation (ECF No. 82) was pending, Plaintiff filed another Motion to Supplement his Complaint on July 12, 2021. (ECF No. 85). This Motion was denied as untimely and "for the same reasons enumerated in Chief Judge Hickey's Order of August 2, 2021," on August 5, 2021. (ECF No. 87).

On August 16, 2021, Plaintiff filed a Motion for Reconsideration of Chief Judge Hickey's Order (ECF No. 90) denying his Motion to Supplement (ECF No. 86) and the undersigned's Order of August 12, 2021 (ECF No. 87), denying his subsequent Motion to Supplement.  In this Motion, Plaintiff raised a new argument that, pursuant to Local Rule of Civil Procedure 16.2, he was not required to follow the Scheduling Order in the case because he is a *pro se* prisoner.  On August 25, 2021, the undersigned entered a Report and Recommendation concerning this Motion.  (ECF No. 91).  It was recommended that the motion be denied, and that Plaintiff be advised the Court's authority to manage cases includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process, up to and including the outright dismissal of a case.  (*Id*. at 5).  Plaintiff did not file an Objection, and Chief Judge Hickey adopted the Report and Recommendation on September 21, 2021.  (ECF No. 92).

Claim Against Defendant Sue Alford

Plaintiff's sole claim against Defendant Alford is **Claim Thirteen**, in which he alleges he received requested medical records from the Arkansas State Hospital on March 20, 2019.  Plaintiff alleges Mail Room Supervisor Alford intercepted his medical records from the Arkansas State Hospital, which were marked as "Certified - Privileged Mail."  Plaintiff alleges that at the time of filing this action, he has still not been notified by Alford that he had received certified mail and has not received the medical records.  Plaintiff had requested these records to show he had been previously diagnosed with existing illness, and to request appropriate treatment.  Plaintiff believes they were intercepted to prevent him from grieving the denial of physical and mental health care.  (ECF No. 9 at 15-16).  Plaintiff states he knows he received the mail because he received the certified mail receipt from the medical records analyst at the state hospital, signed by Alford.  (*Id*. at 16).  Plaintiff proceeds against Defendant Alford in her personal capacity.  (*Id*. at 16).

Defendant Alford filed a Motion for Summary Judgment on October 5, 2021.  (ECF No. 93).  On October 6, 2021, the Court entered an Order directing Plaintiff to file his Response.  (ECF No. 96).  In the Order, Plaintiff was advised that he must file a separate Statement of Facts which lists:

> (a) any disagreement with the specifically numbered factual assertions contained in the Statement of Undisputed Facts filed by the Defendant; and (b) any other disputed facts that must be resolved at a hearing or trial.

> If Plaintiff disputes any of the facts set forth by the Defendant in the Statement of Undisputed Facts, each numbered paragraph must be identified that contains the fact in dispute and, for each paragraph identified, explain why there is a dispute.

(*Id*.) (emphasis in original).  The Order also advised Plaintiff that failure to timely and properly comply with the Order would result in all of Defendant's facts being deemed admitted, or with the dismissal of his case pursuant to Local Rule 5.5(c)(2).  (*Id*.).

Plaintiff filed a Motion for Extension of Time to file his Response on October 18, 2021.  (ECF No. 99).  This was granted on October 19, 2021.  (ECF No. 101).  Plaintiff filed his Response on October 25, 2021.  (ECF No. 102).  Defendant Alford filed a Reply on October 25, 2021.  (ECF No. 103).  The Reply noted that Plaintiff failed to file a separate Statement of Facts.  (ECF No. 103 at 1-2).  Plaintiff filed a Motion to Submit a Sur-Reply on November 3, 20121.  (ECF No. 104).  This was denied on November 4, 2021.  (ECF No. 105).

Claims Against the Medical Defendants

After two extensions, the Medical Defendants filed their Motion for Summary Judgment on November 19, 2021.  (ECF No. 108).  On November 29, 2021, the Court entered an Order directing Plaintiff to submit his Response.  (ECF No. 111).  This Order repeated the instructions to submit a separate Statement of Facts.  (*Id*.).  On December 2, 2021, Plaintiff filed a Motion for Extension of Time to File, which was granted on December 3, 2021.  (ECF Nos. 112, 113).

Plaintiff filed a second Motion for Extension on January 10, 2022, which was granted on January 13, 2022. (ECF Nos. 114, 115). Plaintiff filed his Response on February 14, 2022. (ECF No. 116).

The Medical Defendants filed their Reply on February 22, 2022, also noting that Plaintiff failed to file a separate Statement of Facts in his Response. (ECF No. 117 at 2). The Medical Defendants also note that Plaintiff concedes that he is only pursuing five of his original claims against the Medical Defendants. They indicate these are:

> 1) Claim Number 1 regarding psychiatric medication and Dr. Raymond Molden (DE # 116 at 2-6); 2) Claim Number 2 regarding pull-ups against Dr. Thomas Daniel (DE # 116 at 6-13); 3) Claim Number 3 regarding urinary incontinence, self-harm, change pads and pull-ups against Dr. Thomas Daniel, Dr. Nannette Vowell, Jason Kelley, Sharonda Long, Dr. Jeffrey Stieve, and Crystal McCoy; 4) Claim Number 5 regarding dental issues against Dr. Larry Davis and Dr. Madison Taliaferro; and 5) Claim Number 11 regarding foot and toe pain and swelling against Tonya Parson.

(*Id.* at 7). The Medical Defendants also note that Plaintiff concedes that Claim Number Fourteen only concerns Rory Griffin, who is no longer a Defendant in this case. (*Id.*). Careful review of Plaintiff's Response indicates this summary is correct.

Thus, Plaintiff's remaining claims against the Medical Defendants are as follows:

**Claim One**: Plaintiff alleges that Dr. Raymond K. Molden ignored his current medication administration record ("MAR") from the Saline County Jail in Benton, Arkansas. Plaintiff alleges Dr. Molden abruptly stopped his psychiatric medications on December 19, 2014, resulting in a severe psychotic episode and at least two attempted suicides. Plaintiff alleges that Dr. Molden knew or should have known that his medications were taper-stop only, and the abrupt cessation of a taper-stop medication is cruel and unusual punishment. Plaintiff alleges that Dr. Molden's denial of psychiatric medication is ongoing as of June 15, 2020. (ECF No. 9 at 4). Plaintiff further alleges that by custom, Wellpath does not treat insomnia and other serious mental health needs,

even though sleep is a basic need. (*Id*. at 5). Plaintiff proceeds against Dr. Molden in both his official and personal capacity. (ECF No. 9 at 4).

 **Claim Two**: Plaintiff alleges that from August 23, 2017, to December 11, 2017, Dr. Daniel refused to treat Plaintiff's urinary incontinence with pull-ups or adult diapers. Plaintiff suffered rashes due to sleeping in puddles of urine, and suffered from humiliation, depression, and suicidal ideation. (*Id*. at 5). Plaintiff proceeds against Dr. Daniel in his personal capacity. (*Id*.).

 **Claim Three**: Plaintiff alleges that from August 23, 2017, to the present, Dr. Daniel, Dr. Vowell, Nurse Kelley, Physician Assistant ("PA") Long, Dr. Stieve, and Crystal McCoy denied him urinary incontinence supplies, including pull-ups, change pads, extra sheets, and other bedding. (*Id*. at 6). Plaintiff alleges that other inmates with urinary incontinence received these supplies; he is not aware of any other inmate with urinary incontinence who has been denied supplies. Plaintiff further alleges that he was frequently woken up by other inmates who demanded that he clean up and change his bed when urine ran off his mat onto the floor. This resulted in chronic sleep-deprivation. Plaintiff believes the denial of incontinence supplies was a form of retaliation because he filed grievances concerning his medical care. (*Id*. at 11). Plaintiff proceeds against these Defendants in their personal capacity. (*Id*. at 6).

 **Claim Five**: Plaintiff alleges Dr. Davis and Dr. Talliaferro have provided him with inadequate and untimely dental care starting in November 2016. (*Id*. at 11). Plaintiff alleges the delays in dental care have resulted in the loss of teeth that could have been saved if he had been seen in a timely manner. The delays have also caused severe pain and suffering. Further, when more than one repair is needed, one repair is made, then the other repair is moved to the bottom of the repair list. Plaintiff alleges he has been required to have teeth extracted before others would be filled and has waited for nearly one and a half years to have two teeth filled. He was told last

week that one tooth must now be extracted due to the delay.  Plaintiff further alleges that Dr. Talliaferro is physically incapable of performing his job because his hands shake.  Teeth filled by Dr. Talliaferro have needed to be extracted, and he left pieces of tooth in Plaintiff's jaw after an extraction.  Plaintiff then needed to undergo dental surgery where his jawbone was shaved, and the leftover parts of teeth removed.  Plaintiff states he just needs the pain to stop; it currently hurts to chew soft noodles.  (*Id*. at 12).  Plaintiff alleges that Wellpath has a custom of delaying dental care so that inmates will choose extractions, which are provided in a timelier manner than other dental work, and of moving additional repairs to the bottom of the repair list.  (*Id*.)  Plaintiff proceeds against these Defendants in both their official and personal capacities.  (*Id*.).

**Claim Eleven**: Plaintiff alleges Nurse Parsons denied him medical care for foot pain on June 13, 2019.  (*Id*. at 14).  He alleges she refused to acknowledge that his toe was swollen, refused to provide any care, and delayed his appointment with a podiatrist.  He was seen by a podiatrist on August 20, 2019, at which time the specialist diagnosed him with torn ligaments "within 1 minute" of seeing him, and prescribed surgery.  Plaintiff underwent surgery on October 31, 2019.  (*Id*. at 14-15).  He alleges Nurse Parsons regularly ignores his medical complaints.  Plaintiff proceeds against this Defendant in her personal capacity.  (*Id*. at 14).

On March 8, 2022, mail sent to Plaintiff was returned marked "Inmate Refused."  (ECF No. 118).  The Court entered a Show Cause Order on March 8, 2022, directing Plaintiff to Respond by March 22, 2022.  (ECF No. 119).  This Order was not returned as undeliverable.  Plaintiff filed a Response on May 2, 2022, stating that he had never refused mail, and believed that an ADC officer had mistaken him for another inmate with the same last name who often refused mail.  (ECF No. 120).

## II.        LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.        ANALYSIS

#### A.        Plaintiff's Failure to Comply with Local Rules

Local Rule 56.1(a) requires any party moving for summary judgment to submit a separate statement of undisputed material facts.  Local Rule 56.1(b) requires the non-moving party opposing the summary judgment motion to file a separate statement of disputed facts.  *Pro se*

inmates are advised of this requirement in the Order directing them to file a summary judgment response. *Pro se* inmates are also advised of this requirement in the District's Prisoner Litigation Guide, which contains an example to help them understand the concept of using the same paragraph numbering as that used by the moving party in their own statement of disputed facts.

As both Defendant Alford and the Medical Defendants have correctly argued, Plaintiff failed to provide his separate Statement of Disputed Facts in his Responses to both summary judgment motions. Given Plaintiff's prior motion concerning Local Rule 16.2, he has clearly read the Local Rules. Thus, the Court can only infer that Plaintiff chose to ignore both the Local Rules and two Court Orders when he failed to file his Statement of Disputed Facts in both of his Responses.

Due to Plaintiff's failure, both Statements of Facts submitted by the Defendants are deemed admitted pursuant to Local Rule 56.1(c). In determining whether there are genuine disputes of material fact, however, the Court has also considered the allegations set forth in Plaintiff's verified Amended Complaint. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep't.*, 241 F.3d 992, 994-95 (8th Cir. 2001). "[A] complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint ...." *Id*. As the Court in *Roberson* pointed out, "[a]lthough a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit to survive the summary judgment motion. *Id.* The Court will, therefore, "piece[] together [Plaintiff's] version of the facts from the verified complaint ...." *McClanahan v. Young*, No. 4:13-cv-04140, 2016 WL 520983, *1 (D.S.D. Feb. 5, 2016).

There is some question, however, as to what portion of Plaintiff's Amended Complaint should be considered verified.  Plaintiff did not submit his Original Complaint on the Complaint form for this District.  Although his Original Complaint had a section at the end for him to sign and date it under penalty of perjury, it was left blank.  (ECF No. 1 at 61).  Plaintiff was ordered to submit an Amended Complaint on the approved form for this District, which he submitted two weeks after the deadline and after an Order to Show Cause was entered.  (ECF No. 9).  Plaintiff failed to submit his Complaint on the form for this District as ordered.  Instead, he retyped the form, copying some standard questions and format, and adding, deleting, and reordering sections at will.  (*Id*.).  As a result, his signature stating that the "foregoing" was true and submitted under penalty of perjury was inserted at page seven, and precedes Claims Three through Fourteen, which are typed on pages eleven through sixteen.  (*Id*.).  Thus, there is some question as to whether Claim Three through Claim Fourteen were submitted under penalty of perjury.  As the case has progressed to the summary judgment stage, however, the Court will accept the verification as applying to all his claims in his Amended Complaint.

This leaves the issue of document citation to the summary judgment record.  Plaintiff was also advised in the Court's Orders directing him to file a Response that:

> if he intends to rely upon any records or exhibits that have been previously filed with the Court, Plaintiff must specifically refer to those documents by ECF document and page numbers.  The Court will <u>not</u> sift through the file to find support for the factual contentions.  *See Crossley v. Georgia-Pacific Corp*., 355 F.3d 1112, 1113-14 (8th Cir. 2004) (affirming the grant of summary judgment because a plaintiff failed to properly refer to specific pages in the record that supported his position).

(ECF Nos. 96, 111) (emphasis in original).  Plaintiff only intermittently employed a close facsimile of the ordered document citation in his Reponses.  The Court will reference those documents which Plaintiff identified by the required citation for this Report and Recommendation.  The Court will

*not* sift through the voluminous summary judgment record or guess at the identity of documents to find factual support for his arguments.

## B.      Defendant Sue Alford

Defendant Sue Alford argues that summary judgment in her favor is appropriate on Plaintiff's Claim Thirteen because Plaintiff failed to allege sufficient facts to support a constitutional claim against her as she merely handed a mail packet to her supervisor who then took the packet to the ADC health administrator.   (ECF No. 95).

Plaintiff argues that Defendant Alford's actions concerning his medical records from the Arkansas State Hospital were a violation of both ADC mail policy regarding privileged mail and the constitutional principles detailed in *Procunier v. Martinez*, 416 U.S. 396 (1974).

Defendant Alford's Statement of Facts indicates she received Plaintiff's Medical Records from the Arkansas State Hospital on March 29, 2019. (ECF No. 94 at ¶ 3).  She was not able to determine if the mail was privileged, as the sender of the mail was listed as an individual, not a state agency. (*Id*. at ¶¶ 13, 14).  She did not open the mail.  Instead, she took it to her supervisor, Deputy Warden Outlaw, who informed her that mail sent by an individual was not privileged.  (*Id*. at ¶ 4; 94-5 at 2).  Deputy Warden Outlaw opened the mail and told Defendant Alford that he would take care of it.  (*Id*. at ¶ 15).  Deputy Warden Outlaw later informed her that he had notified Plaintiff and forwarded the medical records to the health administrator.  (*Id*. at ¶ 17).  Plaintiff stated in his grievance that on or about April 20, 2019, he was stopped in the hallway by Deputy Warden Outlaw, who stated, "those medical records you have been trying to get are in the day clinic.  When they finish removing what is a security risk, you can have the rest."  (*Id*. at ¶ 12). Plaintiff deposition testimony confirms that he was informed by Deputy Warden Outlaw that his medical records are in the day clinic.  (*Id*. at ¶ 17).  Plaintiff also stated in his deposition that the

14

ADC mental health administrator notified him that she had the requested records.  (*Id.* at ¶ 19).

Plaintiff's medical records were available for review at his request.  (*Id.* at ¶ 20).  Defendant Alford

also described ADC Medical Policy 800 which outlines how inmates place requests to view

medical records, and how they are given additional time to do so when there is pending litigation.

(*Id.* at ¶¶ 5-11).  Defendant Alford has no responsibility for an inmate's review of their medical

records.  (*Id.* at ¶ 21).  Plaintiff "suffered no prejudice and no injury as his medical records were

available for his review at the mental health administrator."  (*Id.* at ¶ 20).

    Plaintiff cited two documents regarding this claim in his Response.  He cites to Document

94-3 at paragraph 7.  This is a declaration by Defendant Alford.  Plaintiff quotes Defendant

Alford's statement that she was unable to determine if the mail packet was privileged because "the

sender of the mail was Monica Simon, ASH, 305 S. Palm Street, Little Rock, Arkansas 72205."

(ECF No. 94-3 at 1).  Plaintiff also cites to "Doc 94-5 PageID 1085, it states at 3."  This is an ADC

Administrative Directive 18-37, concerning Inmate Correspondence.  Plaintiff points to paragraph

3, page 2, which states that mail from any Federal or State Official or Agency is privileged mail,

if it is sent in an official capacity.  (ECF No. 94-5 at 2).  The policy also indicates that incoming

privileged mail should be opened only in the presence of the inmate, and then inspected for

contraband.  Further, "[a]ll incoming privileged mail should be in official letterhead envelopes and

should be clearly identified as "Privileged Correspondence."  (ECF No. 94-5 at 5).

    Even assuming, *arguendo*, that Defendant Alford violated ADC Administrative Directive

18-37, such a violation does not constitute a violation of Plaintiff's federal constitutional rights.  It

is well settled that prisoners do not have a constitutional right to enforce compliance with internal

prison rules or regulations.  *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("there is no

federal constitutional liberty interest in having ... prison officials follow prison regulations");

*Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("there is no § 1983 liability for violating prison policy").[3]

Plaintiff also cites to *Procunier v. Martinez*, 416 U.S. 396 (1974), arguing that the case lays out certain constitutional requirements for prisoner mail:

> (1) prisoners must be notified when officials refuse to send their letters, *or rejecting in-coming letters; (2) the author of a censored/confiscated letter must be afforded an opportunity to contest the decision;* (3) complaint must be heard by a person other than the person who originally disapproved the letter; and (4) regulations censoring mail violate the First Amendment.

(ECF No. 102 at 3) (emphasis added by Plaintiff).  Plaintiff argues that Defendant Alford violated these requirements when she intercepted his mail for a second time,[4] and she did not notify him of the Arkansas State Hospital mail packet arrival or permit him to contest the confiscation of the mail.  Plaintiff's reliance on this case is misplaced, as *Procunier* is no longer valid precedent for the purpose Plaintiff cited the case.  *See Human Rights Defense Center v. Baxter County, Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021) (citing *Turner v. Safley*, 482 U.S. 78 (1987); *Thornburgh v. Abbott*, 490 U.S. 401 (1989)).  Further, even if *Procunier* still stated the correct legal standard for incoming inmate mail, it is factually distinguishable, because Plaintiff's Arkansas State Hospital mail was not rejected or confiscated by Defendant Alford or the ADC.  Instead, the medical records were sent to the ADC Health Administrator and Plaintiff was informed they would be available for his review after a security check was performed.

Accordingly, there is no material issue of disputed fact concerning Plaintiff's claim against Defendant Alford, and she is entitled to summary judgment as a matter of law.

---

[3] To the extent Plaintiff's medical records from the Arkansas State Hospital could be considered a form of legal mail, it is well-settled in the Eighth Circuit that "an isolated incident [of opening legal mail] with no evidence of interference with an inmate's right to counsel or access to the courts is insufficient to state a claim." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012).

[4] Plaintiff references a request for these documents from the Arkansas Hospital, which were sent by standard mail, as opposed to certified mail, in December of 2018.  His Complaint, however, is limited to the March 20, 2019, claim.

## C.     The Medical Defendants

Plaintiff alleges that the Medical Defendants were deliberately indifferent to his many reported medical needs.  The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners.  *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).  "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Long*, 86 F.3d at 765).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany*, 132 F.3d at 1239).  To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more

even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). This is an "onerous standard," *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013), requiring a prisoner to "clear a substantial evidentiary threshold." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010). A plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Intentionally denying or delaying access to medical care may constitute deliberate indifference. *See Dulany*, 132 F.3d at 1239.

The Medical Defendants do not argue that Plaintiff failed to meet the objective prong of the test. As discussed below, however, the summary judgment record shows no evidence that the subjective prong of the deliberate indifference standard was met. Instead, Plaintiff's allegations are merely a long diatribe of disagreement with his medical treatment.[5]

### 1.    Claim One – Psychiatric Medication

In his Amended Complaint, Plaintiff alleges that Dr. Raymond K. Molden ("Dr. Molden") ignored his current medication administration record ("MAR") from the Saline County Jail in Benton, Arkansas. Plaintiff alleges that Dr. Molden abruptly stopped psychiatric medications on December 19, 2014, resulting in a severe psychotic episode and at least two attempted suicides. Plaintiff alleges that Dr. Molden knew or should have known that his medications were taper-stop only, and the abrupt cessation of a taper-stop medication is cruel and unusual punishment. Plaintiff

---

[5] As there is no evidence of deliberate indifference to Plaintiff's medical needs in the summary judgment record, it is not necessary to address whether that alleged deliberate indifference was applied in retaliation for Plaintiff filing grievances about the quality of his care.

alleges that Dr. Molden's denial of psychiatric medication is ongoing as of June 15, 2020. (ECF No. 9 at 4). He proceeds against this Defendant in both personal and official capacity, stating that Wellpath has a custom of failing to treat insomnia and other serious mental health needs, "even though sleep is a basic need." (*Id*. at 5).

In his deposition, Plaintiff clarified that he saw Dr. Molden on his intake into the ADC, which occurred at the Ouachita River Unit, and that Dr. Molden only sees ADC intake patients. (ECF No. 109-7 at 81-82). Plaintiff also confirmed that he only saw Dr. Molden on that single occasion and was transferred to another unit shortly thereafter. (*Id*. at 82). He testified that his claim against Dr. Molden is based on Dr. Molden's discontinuation of some of his psychotropic medications, that other psychiatrists referred to Dr. Molden's notes, and that he still suffers from ADHD and insomnia, which began when his medications were stopped in 2014. (*Id*. at 85-86).

In his Objection to the pre-service screening Report and Recommendation, Plaintiff argued that Dr. Molden's psychiatric care constituted a continuing violation which should defer the accrual of his claim. (ECF No. 21). In support of this argument, Plaintiff cites West headnote number one in *Jervis v. Mitcheff*, 258 F. App'x 3 (7th Cir. 2007):

> State prisoner's § 1983 claim alleging deliberate indifference to a serious medical need was not barred by statute of limitations, regardless of whether prisoner sued more than two years after he saw prison doctor for the first and only time, as statute of limitations commenced anew every day that treatment was withheld.

(ECF No. 21 at 3). Plaintiff states that the ongoing conditions that have not been treated were insomnia and psychosis. (ECF No. 21 at 3). Plaintiff argues he should receive Trazedone for his insomnia and Thorazine for his psychosis. He argues his symptoms are now only partly controlled with alternative medications. (*Id*.).

The Medical Defendants argue that most of Plaintiff's grievances for this claim relate to a period outside of the statute of limitations for this case. Further, they argue that Plaintiff testified

in his deposition that he was only examined and treated one time by Dr. Molden – on December 19, 2014.  Thus, they appear to argue[6] that even if Plaintiff retrospectively grieved Dr. Molden's actions within the three-year statute of limitations for this case, Dr. Molden's conduct occurred well outside the applicable statute of limitations.

The Medical Defendants note that, in his deposition for this case, Plaintiff testified he filed several grievances concerning Claim One: VU-15-00152; VU-15-01393; VU-15-01542; OR-17-00005; OR-17-00018; OR-17-00403; OR-17-00694; OR-17-00903; OR-17-01126; OR-18-01006; and OR-18-01131.  The Court has reviewed these grievances.

In VU-15-00152, signed by Plaintiff on January 25, 2015, Plaintiff states he is experiencing hallucinations, is confused, and is hearing voices, and needs to be put back on his mental health medications.  (ECF No. 109-5 at 2).  He also states he has been on anti-psychotic medication for 16 years.  (*Id*.).  Plaintiff does not mention Dr. Molden by name in the grievance.  (*Id*.).  The final grievance response states he was seen by Dr. Richard since arriving at the Varner Unit on January 5th, 15th, and 26th of 2015.  He was also seen by mental health department on February 9th and March 2nd of 2015.  Dr. Richard prescribed psychiatric medications on February 2, 2015.  (ECF No. 109-5 at 1).  The response further notes that Dr. Richard indicated that Plaintiff "was not going to be happy unless started on at least 3 meds including primarily Thorazine.  This is consistent with personality disorder." (*Id*.).  The response also notes that he was seen in the psychiatric clinic at the Ouachita River Unit on intake, and the psychiatric provider there found no clinical evidence that warranted the prescription of psychotropic medications at that time.  (*Id*.).  The appeal was found to be without merit.  (*Id*.).

---

[6] The Medical Defendants' argument on this issue is not entirely clear, as it is limited to two sentences which are devoid of any citation to legal precedent or of any actual legal analysis.

In VU-15-01393, signed by Plaintiff on July 25, 2015, Plaintiff grieved that he was taken off Thorazine because it was removed from the formulary, and was placed on another psychotropic medication.  (ECF No. 109-5 at 5).  He states he has taken Thorazine for many years when not incarcerated, and alleges Dr. Lee "is providing easier, less efficacious care."  (*Id*.).  Dr. Molden is not identified at the beginning of the grievance, as required by the ADC grievance policy.  He is mentioned in Plaintiff's grievance appeal, where he states that Dr. Molden prescribed him Thorazine in 2009 to 2010.  "The same Dr. that cut me off after 10 days in Diagnostics."  (*Id*. at 6).  The final response indicates that Dr. Lee prescribed three different psychotropic medications to treat Plaintiff's reported symptoms.  It also admonishes Plaintiff that Dr. Lee is a licensed psychiatrist who may "decide not to prescribe meds, prescribe meds, change, or discontinue psychotropic medications utilizing his expertise and professional judgment."  (ECF No. 109-5 at 4).  The Response also indicates that Plaintiff's community records were requested, received, and reviewed.  (*Id*.).  The appeal was found to be without merit.  (*Id*.).

In VU-15-01542, signed by Plaintiff on August 4, 2015, Plaintiff grieves that Dr. Molden was well-aware of his mental illnesses but does not like him.  Thus, he discontinued all his psychiatric medications, including Thorazine, on intake in the ADC.  As a result, Plaintiff "had SI, HI, and could not sleep or eat for more than [off edge of page copy] days."  (ECF No. 109-5 at 9).[7] The initial response states Plaintiff has been seen by the psychiatric provider and prescribed the medication deemed appropriate.  (*Id*.).  Plaintiff's appeal for this grievance was rejected as untimely.  (ECF No. 109-5 at 7).

The remaining grievances for this claim were filed in the ADC Ouachita River Unit. Starting with OR-17-00005, Plaintiff begins grieving of a "conspiracy to deprive him of treatment

---

[7] In his deposition for this case, Plaintiff stated he could not sleep "for four or five days when he first got to Varner." (ECF No. 109-7 at 54).

for serious illness" starting in 2014 with Dr. Molden.  (ECF No. 109-5 at 12).  It appears that Plaintiff signed the unit level grievance on December 23, 2016.[8]  (*Id*.).  In his appeal for this grievance Plaintiff indicates that an unnamed new doctor, who talked to him by video, adjusted one of his medications, listed as "venlafoxine."  (*Id*. at 11).  He also identifies his current issues as "anxiety, grinding teeth, anxious fidgeting - counting complicating my going to sleep."  (*Id*.).  This grievance was found to be without merit, with the Health Service response stating that Plaintiff is seen by mental health staff on a regular basis and is being prescribed medication deemed appropriate by the psychiatrist.  (*Id*. at 11).  The final response indicates this grievance was a duplicate of "numerous grievances previously filed" by Plaintiff, and as such, should have been rejected at the unit level.

Grievance OR-17-00018 was found to be a duplicate of "numerous grievances previously filed by you regarding your mental health medications and your medical health services."  (*Id*. at 14).  It was found to be without merit, and it was determined it should have been rejected at the Unit Level as a duplicate.  (*Id*.).  Plaintiff received the same response for OR-17-00403, OR-17-00903, OR-17-01126, and OR-17-01126.  (*Id*. at 18, 25, 26, 31).  Plaintiff's appeal in OR-17-00694 was denied as untimely.  (*Id*. at 22).  In OR-18-01006, Plaintiff grieved that he was having side effects from the drugs "Risperdol" and "Pherphenazine," including vison issues and male breast enlargement, and was not warned of these risks.  He states he had no issues with the Chlorpromazine and Thorazine that Dr. Molden gave him in 2009.  (ECF No. 109-5 at 38).  The Response noted that he had not informed his psychiatric provider about the side effects he was grieving and should do so.  (*Id*. at 35).  The grievance was found to be without merit.  (*Id*. at 36).  OR-18-01131 was denied as a duplicate of OR-18-01006.  (*Id*. at 39).

---

[8] The copy of this grievance is in poor condition and difficult to read.

In his summary judgment Response, Plaintiff does not dispute that these are the relevant grievances.  Plaintiff alleges there are several references in unidentified documents indicating that providers were consulting Dr. Molden concerning his treatment.  He accuses the Defendants of failing to provide those documents to the Court.  (ECF No. 116 at 4).  Plaintiff does not reference the grievances in his Declaration.

Plaintiff's argument that Dr. Molden's decision to discontinue certain medications in 2014 was a continuing violation which should permit him to defer accrual of his claim is contradicted by the summary judgment record.  As Chief Judge Hickey noted in her Order of September 20, 2020 (ECF No. 22), the doctrine of continuing violation is not one that has been applied to a case such as this in the Eighth Circuit.  (*Id*. at 4).  She further noted that:

> The Second Circuit has held "that the continuing violation doctrine can apply to Eighth Amendment claims of medical indifference brought under 42 U.S.C. § 1983 when the plaintiff ... 'allege[s] both the existence of an ongoing policy of [deliberate indifference to a serious medical need] and some non-time-barred acts taken in furtherance of that policy.'"  *Shomo v. City of N.Y.*, 579 F.3d 176, 179-82 (2d Cir. 2009) (citing *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999)).

(*Id*.).  The court in *Shomo* further stated, however, "[t]hat the continuing violation doctrine *can* apply, however, does not mean it must. ... This test screens out Eighth Amendment claims that challenge discrete acts of unconstitutional conduct or that fail to allege acts within the relevant statutory period that are traceable to a policy of deliberate indifference."  *Shomo*, 579 F.3d at 182; *see also Gonzalez v. Hasty*, 802 F.3d 212, (2d Cir. 2015) (The continuing violation "applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment.") (Cleaned up).

Given the summary judgment record before the Court, Plaintiff's citation to *Jervis v. Mitcheff*, 258 F. App'x 3 (7th Cir. 2007) (unpublished) is deserving of closer review.  The case

was appealed after the lower court granted a Motion to Dismiss in favor of the Defendant.  The

Seventh Circuit succinctly summarized the facts as follows:

> According to Jervis, another prisoner shoved him down a flight of stairs on August
> 2, 2003, and he landed on a cement floor with his left leg pinned beneath him.
> Afterward he experienced extreme pain in his left knee.  The fall also reinjured a
> herniated disc in his back that had required surgery in 1999, which caused
> additional pain.  Jervis has been confined to a wheelchair since the fall.
>
> Jervis saw Dr. Mitcheff on September 2, 2003.  Mitcheff told Jervis that he did not
> need the wheelchair because there was nothing wrong with him.  Mitcheff also
> accused Jervis of lying about his previous back surgery and made no effort to obtain
> the medical records from that surgery.  During the examination, Mitcheff grabbed
> and twisted Jervis's left knee, causing him excruciating pain.  Despite the pain,
> Jervis was placed in a hospital segregation cell for six months, during which time
> he did not receive medical care.
>
> For the next 24 months until Jervis filed suit (he signed his original complaint in
> August 2005, but it did not reach the district court until September), he continued
> directing complaints to Dr. Mitcheff about the pain in his knee and back but was
> never examined again.  Jervis also asked to be evaluated by an orthopedic specialist,
> but Mitcheff refused to order a consult or even give him pain medication for his
> injuries.  As far as we can discern, Jervis has not yet received treatment for his knee
> or back injuries.

*Jervis*, 258 F. App'x at 4-5.  Because the plaintiff in *Jervis* had seen only one physician for a single

exam, and he had received no medical care whatsoever after that single exam, the Seventh Circuit

held that his claim was not barred by the statute of limitations.

The *Jervis* case, however, is distinguishable from the situation in the present case.  In

*Jervis*, the plaintiff was seen one time by the prison doctor, was denied all care (including pain

medication) for 24 months based on that single examination, and he was not seen by any other

medical provider during that time.  The Seventh Circuit also noted that the prison doctor made no

attempt to verify the plaintiff's earlier medical records concerning his earlier back surgery.  Here,

Dr. Molden examined Plaintiff a single time during his ADC intake on December 19, 2014.  The

similarity between *Jervis* and this case ends after that single examination, however, because the

responsibility for Plaintiff's mental health care was assumed by another psychiatrist a few weeks later at the Varner Unit, where he was housed after intake.  Further, the grievance responses, Plaintiff's own statements in the grievances, his deposition testimony, and his ADC psychiatric records, show that he was seen in the mental health clinic frequently, his free-world and Arkansas State Hospital records were sought and included in his ADC medical file for review, and his psychiatric medications were discussed, reviewed, and adjusted or changed as deemed medically appropriate by medical professionals.  Plaintiff's grievances and ADC psychiatric records indicate he was seen by at least three other psychiatrists prior to filing this case, one of which he praised as "very professional" in OR-17-00403.  (ECF No. 109-14 at 35, 39).  Nothing in Plaintiff's ADC psychiatric records indicates that these subsequent psychiatrists failed to use their independent medical judgment.  Although Dr. Molden's intake notes did, of course, remain in Plaintiff's ADC psychiatric record, nothing in the summary judgment record indicates that Dr. Molden was in any way responsible for Plaintiff's mental health care past that single, discrete, intake examination on December 19, 2014.[9]

Thus, even if the Eighth Circuit were to consider the adoption of the continuing violation doctrine as outlined by the Second and Seventh Circuits, this is not a case where it would apply. Plaintiff's argument that Dr. Molden's care constituted a continuing violation which delayed accrual of his cause of action is plainly contradicted by the summary judgment record.  Plaintiff's Claim One against Dr. Molden for a single intake examination on December 19, 2014, is barred

---

[9] Similarly, the *Shomo* case also fails to support Plaintiff's contention.  The court in *Shomo* held that the policy in question for the case could not be construed as an ongoing policy of denial of medical care when the plaintiff had been seen frequently by doctors and brought to hospitals.  *Shomo*, 579 F.3d at 182.  Instead, the ongoing policy to be addressed was that of on-site staff repeatedly denying the plaintiff disability accommodations despite the recommendation of treating physicians.  (*Id.*).  Plaintiff makes no such allegation here.  Instead, his continuing violation argument is based on the speculation that his treating psychiatrists continued to follow Dr. Molden's recommendations after his intake exam, which, as discussed above, is contradicted by the summary judgment record before the Court.

by the statute of limitations.  There are no material facts in dispute, and Dr. Molden is entitled to

summary judgment on this claim as a matter of law.

## 2.      Claim Two – Pull-Ups

For Claim Two, Plaintiff alleges that from August 23, 2017, to December 11, 2017, Dr.

Daniel refused to treat Plaintiff's urinary incontinence with pull-ups or adult diapers.  Plaintiff

alleges he suffered rashes due to sleeping in puddles of urine, humiliation, depression, and suicidal

ideation because he was not given pull-ups.  (ECF No. 9 at 5).

It is undisputed that Plaintiff received a prescription for pull-ups on December 11, 2017.

What is less clear from the record is when Plaintiff first reported to Dr. Daniel that he was having

issues with incontinence.  In his summary judgment Response, Plaintiff states he complained about

wetting the bed to Dr. Daniel on September 3, 2017 (ECF No 116 at 6), but first started wetting

the bed on August 23, 2017.  (*Id*. at 7).  In his Declaration, Plaintiff states that on September 3,

2017, non-Defendant LPN Gifford wrote on a sick call that he "must report any episodes of falls,

blacking out, and bed-wetting, <u>when they happen</u>."  (ECF No. 116-1 at 6) (emphasis in original).

The Medical Defendants note that Plaintiff filed three grievances on this issue, only one of

which was addressed on the merits, and they appear to suggest that October 2017 should be the

starting date for this claim.  The Medical Defendants note that Plaintiff testified in his deposition

to filing three grievances on this issue: OR-17-01794, OR-17-01832, and OR-17-01833.[10]  (ECF

No. 110 at 15).  Grievance OR-17-01832 was rejected as untimely on appeal.  (*Id*.).  The appeal

response to OR-17-01794 was found to be a duplicate of OR-17-01833 and Plaintiff was told refer

to that grievance.  (*Id*.).  The final appeal Response to OR-17-01833 states:

> On October 16, 2017, you grieved you have not been given pull ups.  You state you
> have started wetting yourself at night and have been asking for pull ups for over a

---

[10] In his Response, Plaintiff argues that he filed "numerous grievances, not just three," but does not identify those
additional grievances.  (ECF No. 116 at 6).

month.  You stated you informed Nurse Gifford, Nurse McCoy, and Dr. Daniel of your issue, but Nurse Gifford informed you that you needed to get security to check for a wet bed before you would be issued pull ups.  You stated you are in danger because of your issue, and you are in a barracks where incontinence is not taken lightly by the other inmates.

The medical department responded, "You state that you need pull ups for incontinence and staff will [not] provide pull ups for you.  A review of. your medical record reveals that you were seen by a provider on 10/10/2017 and that pull ups were not medically indicated for your condition.  For this reason I find your grievance to be without merit."

Your appeal states it is cruel and unusual punishment to force you to release your waste in front of others, and it is unhygienic.  You state you are wetting your bed every single night, and you need to know why you are incontinent. You state you are too young for pull ups, but need them until you can receive a diagnosis.

Dr. Daniel noted in your October 10, 2017 encounter that you were attempting to manipulate him because he denied your request for pull ups. He noted that there was no indication that pull ups were medically necessary, and that he would consider ordering them when you asked if he would order them if you showed an officer evidence of you peeing the bed.  You were seen by Dr. Daniel again on November 13, 2017 and he issued you a restriction to return to the Infirmary if any involuntary urination occurred. Dr. Daniel saw you again on December 11, 2017 and issued pull ups until you can be seen by urology.

You have been seen and treated based on what is medically indicated per Dr. Daniel's medical judgment, and you have been issued pull ups until your urology consult; therefore, this appeal ls without merit.

(ECF No. 109-5 at 47).

Based on Plaintiff's medical record, Plaintiff was seen twice on August 1, 2017, for his complaints of a cough.  (ECF No. 109-10 at 30-31).  He was seen by Dr. Daniel on August 25, 2017, and, while he had several other physical complaints, he "denied ... abdominal pain or bladder issues."  (ECF No. 109-10 at 31).  Plaintiff was seen by Dr. Daniel on September 1, 2017, and he complained of the need to urinate frequently at night, and that this issue had been ongoing for about three (3) weeks.  He did not complain of incontinence or bed-wetting. (ECF No. 109-10 at 32).  Plaintiff's first report of incontinence and first request for pull-ups appears in his medical

record in his exam with Dr. Daniel on September 22, 2017.  (*Id*. at 33).  Thus, Plaintiff's claim that Dr. Daniel denied him pull-ups starting on August 23, 2017, is contradicted by the medical record.  Accordingly, the Court will use September 22, 2017, as the starting date for Claim One. As will be discussed below, however, the exact starting date is largely irrelevant to the analysis of this claim, as there is no evidence in the summary judgment record that Dr. Daniel was deliberately indifferent to Plaintiff's medical needs.

Plaintiff's argument for Claim Two is, essentially, that Dr. Daniel should have immediately given him pull-ups when Plaintiff requested them rather than trying to verify if they were medically necessary.  In his Amended Complaint, Plaintiff speculates that the denial was a form of retaliation for filing grievances about the quality of his medical care.

A thorough review of Plaintiff's ADC medical and psychiatric records, however, indicates that objective verification of any health complaint by Plaintiff had been recommended by Plaintiff's psychiatrists and was, itself, a medical necessity.  Specifically, Plaintiff's psychiatric records indicate a long history of malingering.[11]  Plaintiff's intake psychiatric examination on December 19, 2014, indicates that when Plaintiff was last in the ADC in 2010, his diagnoses were Alcohol Dependence, Cluster B Personality, rule out malingering, and rule out schizoaffective disorder.  (ECF No. 109-14 at 1).  His diagnosis at intake was Alcohol Dependence, Rule out Malingering, Personality Disorder NOS, and Rule Out Borderline Personality Disorder.  (*Id*. at 2). Treatment notes indicated Plaintiff should be monitored for "signs & symptoms of genuine illness" and psychology testing for malingering was ordered.  (*Id*.).  On December 22, 2014, the Miller

---

[11] "Malingering" is not considered a mental illness.  In the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, malingering receives a V code as one of the other conditions that may be a focus of clinical attention.  The *DSM-5* describes malingering as the intentional production of false or grossly exaggerated physical or psychological problems.  Motivation for malingering is usually external (e.g., avoiding military duty or work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs)." Available online at Medscape.com.  (Last accessed June 8, 2022).

Forensic Assessment of Symptoms Test (M-Fast) was administered to Plaintiff.  This test is an "assessment of malingering." (*Id*.).  "He obtained a Total Score of 13, which is a significantly elevated score (cut-off score is 6) and indicates the inmate may be malingering mental illness.  He tended to endorse unlikely and inconsistent symptoms, extreme and uncommon symptoms and his self-report was inconsistent with observed behavior." (*Id*.).  On June 10, 2015, while Plaintiff was incarcerated in the ADC Varner Unit, Plaintiff's records from the Arkansas State Hospital were received and reviewed.  Notes indicated, "Psychological testing [at the Arkansas State Hospital] found that patient was likely grossly exaggerating or feigning symptoms." (*Id*. at 10).  On November 21, 2016, Plaintiff was given psychological testing after he filed a grievance stating he was experiencing thoughts of self-harm and other mental health issues.  (*Id*. at 39).  The results were as follows: "Four subscale scores significantly elevated above clinical cutoff score.  Total Score significantly elevated above clinical cutoff score.  Test results consistent with malingering psychiatric symptoms, with amnestic problems subscale elevated four to five times above clinical cutoff score." (*Id*.).

On January 9, 2017, psychiatric clinic notes indicated that a diagnosis of Somatic Symptom Disorder (SSD) might be appropriate and might partially explain Plaintiff's "preoccupation with pain and perceived function problems." (*Id*. at 42).  On January 30, 2017, staff notes state Plaintiff admitted to lying about information to acquire desired medication and appeared to be doing so in that exam.  Plaintiff also admitted to preparing other inmates "to go to psychiatric clinic to get medication they did not need.  He presents as someone trying to manipulate the system for other reasons than true mental health issues." (*Id*. at 43).  On January 31, 2017, notes by psychiatrist Dr. Brush-Strode noted his history of malingering and stated "[u]nfortunately, due to the presence

of malingering, *it will be very difficult to rely on this inmate's reports of distress; rather, objective indices must remain the primary index of determination*."[12]  (*Id*. at 45) (emphasis added).

With this psychiatric context in mind, the ADC medical record contradicts Plaintiff's allegations that Dr. Daniel denied him pull-ups in retaliation for Plaintiff filing medical grievances. Instead, the summary judgment record indicates Dr. Daniel merely attempted to objectively verify the existence and cause of Plaintiff's reported urinary incontinence for several weeks prior to prescribing pull-ups.  As stated earlier, Plaintiff first reported his incontinence to Dr. Daniel on September 22, 2017.  Dr. Daniel's notes state: "Incontinence: this has never been seen or documented.  Urine ex no real growth.  Dipstick showed 70 WBC.  IM wants pull-ups."  (ECF No. 109-10 at 33).  Dr. Daniel further notes: "Pull-ups were considered but denied b/c not medical necessity.  No evidence to cooberate (sic) his story."  (*Id*.).  An antibiotic for a UTI was prescribed and a follow-up with neurology was scheduled.  (*Id*.).  Plaintiff saw Dr. Daniel again on October 5, 2017, and the notes indicate: "Incontinence: this has never been seen or documented.  Has been worked up for UTI.  IM admits to drinking a LOT of sodas."  (*Id*.).  Dr. Daniel advised Plaintiff to stop drinking so many soft drinks and drink a reasonable amount of water.  He further notes that Plaintiff would "likely benefit from RPU and lots of mental health intervention," and the possibility of BPH.[13]  (*Id*.).

Plaintiff was seen again by Dr. Daniel on October 10, 2017.  (ECF No. 109-10 at 34). Notes indicate Plaintiff threatened Dr. Daniel, stating he would get him fired because he would not give him pull-ups simply because Plaintiff felt he needed them.  (*Id*.).  The following discussion is noted:

---

[12] Plaintiff's psychiatric record is replete with references to malingering, as the word appears 28 times in an 81- page document.  The Court will not refer to all instances.
[13] BPH is benign prostatic hyperplasia or enlarged prostate.  Available online at Medline Plus.  (last accessed June 8, 2022).

> Nothing has ever been documented in this IM.  He has asked that if he pees his bed & shows an officer, would I get him pull-ups?  I replied that I would think about it & I now fully anticipate that the patient will urinate on himself in the middle of the night just to manipulate the situation.  IM has a neurology appointment to be scheduled.  His UA & cultures have been WNL.[14]  It appears that the IM has to have something wrong with him and is almost an attention seeking behavior.  There is no basis or findings in any complaint that the patient has ever brought to me.  I lowered his baclofen to see if it would help his "dizziness" & urination problems.

(*Id*.).

Plaintiff repeated his urinary complaints to Dr. Daniel on November 13, 2017, stating that "he has urinated in the floor and communicated this to officers who do not report the incident." (ECF No. 109-10 at 34).  Dr. Daniel noted that urinalysis was normal and renal function was good. Dr. Daniel also noted that Plaintiff's sister had made complaints to the Arkansas State Nursing Board about Plaintiff's care.  (*Id*.).  A urology consult was to be scheduled upon approval.  (*Id*. at 35).  The notes for the December 11, 2017, exam are as follows:

> Again this was another 45 minute visit as previous visits. The patient will go from one thing to another that he thinks is wrong with him.  IM had a magazine that he had written all over from top to bottom on multiple pages in permanent marker in tiny writing for us to discuss.
>
> Today, patient states that he is refusing to drink water so he will not urinate on himself.  There has only been one documentation when night nurse was called down and it was not evident that the IM urinated on himself.  He continues to talk about sleep walking.  He mentioned looking up all my information at AR State Medical Board.  He says this b/c he has given out everybody's home addresses here. He is trying to get Nurse Gifford fired & states she is biased against him which is not the case.  We discussed that they should keep things professional and cordial.  He said he would apologize.  He is wondering if increasing his terazosin would help.  He states he sleeps but "is not sure I actually sleep."

(*Id*. at 36).  Dr. Daniel adjusted his terazosin and prescribed pull-ups until Plaintiff was seen by urology.  (*Id*.)

---

[14] Within normal limits.

The Medical Defendants provided an affidavit from Dr. Chris Horan, the Regional Medical Director for WellPath, LLC. (ECF No. 109-16). He agrees with Dr. Daniel's approach to ask Plaintiff to provide evidence of his urinary incontinence. (*Id*. at 2). He further notes that items such as pull-ups and catheters can be contraband in a prison setting, and the clinician must both address the needs of the patient while being conscious of prison security considerations. He identified the policy is to "trust, but verify." (*Id*.).

In his Response and Declaration, Plaintiff stresses that he was humiliated, depressed, and suicidal because Dr. Daniel denied him pull-ups immediately upon his request. (ECF Nos. 116 at 10-11; 116-1 at 7). Plaintiff made no mention, however, of incontinence or other urinary issues during psychiatric exams on September 27 and October 25 of 2017. (ECF No. 109-14 at 52). On October 31, 2017, he mentioned the incontinence, but denied any acute mental health distress, and was judged to be doing well from "an objective perspective." (ECF No. 109-14 at 52-53). Urinary tract issues were not mentioned in subsequent visits, although Plaintiff did mention "not as good as before because of some [unspecified] medical concerns" on December 19, 2017. (ECF No. 109-14 at 53-54). Again, there is no dispute that Plaintiff received pull-ups on December 11, 2017, pending his urology consult. Finally, although Plaintiff alleges in his Amended Complaint that he suffered from a rash due to the denial of pull-ups, there is no indication that he complained to any medical care provider of a rash in the urogenital or rectal areas between August 2017 to December 11, 2017.

Thus, the summary judgment record indicates that Plaintiff was seen frequently in the medical clinic for a wide variety of physical complaints; Dr. Daniel ordered urinalysis and other medical tests to determine if there was a physical cause for any incontinence; he prescribed antibiotics and made other adjustments to medication; a urology consult was ordered; and,

ultimately, Dr. Daniel prescribed pull-ups pending that urology consult after several weeks of Plaintiff's continued unverified complaints of incontinence.  Dr. Horan found this approach to be medically appropriate and in accord with prison security concerns regarding contraband.  As Plaintiff was found to have hoarded eight packages (160 pull-ups) in August 2018, this appears to have been a valid security concern.  (ECF No. 109-10 at 52).  Finally, Dr. Daniel's actions were also in accord with Plaintiff's ADC psychiatric file, which repeatedly emphasized Plaintiff's malingering, and recommended that any self-reports of symptoms should be objectively verified.

The summary judgment record undermines Plaintiff's allegations that Dr. Daniel was deliberately indifferent to his medical needs regarding incontinence or the prescription of pull-ups. There is no material fact in dispute, and summary judgment in favor of Dr. Daniel on this claim is appropriate as a matter of law.

### 3.      Claim Three – Pull-ups, Change Pads, Extra sheets, and Other Bedding

For Claim Three, Plaintiff alleges that from August 23, 2017, to "the present," Dr. Daniel, Dr. Vowell, Nurse Kelley, Physician Assistant ("PA") Long, Dr. Stieve, and Crystal McCoy denied him urinary incontinence supplies, including pull-ups, change pads, extra sheets, and other bedding.  (ECF No. 9 at 6).  Plaintiff alleges that other inmates with urinary incontinence received these supplies, and he is not aware of any other inmate with urinary incontinence who has been denied supplies.  Plaintiff further alleges that he was frequently woken up by other inmates who demanded that he clean up and change his bed when urine ran off his mat onto the floor.  This resulted in chronic sleep-deprivation.  Plaintiff believes the denial of incontinence supplies was a form of retaliation because he filed grievances concerning his medical care.  (*Id*. at 11).

As was discussed above in connection with Claim Two, the beginning date for this claim should be September 22, 2017, instead of August 23, 2017.  The alleged ending date for this claim,

i.e., "the present," is also inconsistent with the summary judgment record.  Plaintiff filed his original Complaint on June 9, 2020, alleging that he had been denied incontinence supplies up to the time of the Complaint.  In his deposition, however, Plaintiff testified he no longer needed pull-ups and other incontinence supplies starting at the "end of 2019."  (ECF No. 109-7 at 66).  In his Declaration, Plaintiff says he stopped bed-wetting on July 11, 2019.  (ECF No. 116-1 at 9).  A medical record dated July 29, 2019, notes that Plaintiff reported he was no longer bed-wetting.  (ECF No. 109-10 at 74).  Accordingly, the Court will consider July 11, 2019, as the end date for this claim.

The Medical Defendants indicate that Plaintiff identified four grievances concerning this issue in his deposition: OR-19-00019; OR-19-00139; OR-19-00220; and OR-19-00233.[15]  Plaintiff does not dispute these grievances.  The appeal responses to these documents consistently indicate that Plaintiff had been seen multiple times by multiple providers for this issue, including a urology consult, and there was no medical necessity for the additional supplies.  The final appeal response for OR-19-00233, dated April 8, 2019, states:

> It is documented in the January 31, 2019 [medical] encounter that it was explained to you your case was discussed with the HSA, medical director, and the medical team.  Together, they decided there was no medical necessity at that time for additional supplies at that time.  You have a consult request for urology to re-evaluate  symptoms and for the urologist to guide treatment and additional supplies.  You were seen February 14, 2019 for your complaints of needing pads and the nurse did not note any change or reason to refer you to the provider at that time.

(ECF No. 109-5 at 56).

As stated for Claim Two, Plaintiff was given pull-ups on December 11, 2017, pending his urology consult.   A review of the medical record indicates Plaintiff reported his urinary

---

[15] The Court notes that other than a statement in OR-19-00139 that Defendant Vowel and Kelley were "made aware" of issues (ECF No. 109-5 at 62), none of the named Defendants for this claim except Dr. Daniel are named in these grievances as required by ADC grievance policy.

incontinence was "much better" on January 4, 2018.  (ECF 109-10 at 37).  He repeated that it was "much better" on January 12, 2017.  (*Id*. at 38).  The notes also state: "The patient never went to urology appointment & it is being rescheduled."  (*Id*.).  Plaintiff was seen at the University of Arkansas Medical Sciences ("UAMS") urology clinic on March 12, 2018.  (ECF No. 109-10 at 40).  The UAMS clinic recommendation was for Plaintiff to a self-catheterization four times daily, and to return to UAMS for a urodynamic study.  (*Id*.).  The catheters were prescribed on March 14, 2018.  (*Id*.).  Plaintiff also continued to receive pull-ups, and he asked for an increase in the number in April.  This was initially denied because he was also using the catheters, but then increased in May from 18 per week to 21 per week pending his pending urodynamic study.  (*Id*. at 42, 45).  Plaintiff was also prescribed Oxybutynin[16] on May 22, 2018.  (ECF No. 109-1 at 16).

Plaintiff was seen at UAMS on May 30, 2018, for the urodynamic study, the results of which were negatively affected by his constipation.  (ECF No. 109-10 at 46).  UAMS was contacted to determine if the study needed to be repeated.  (*Id*.).  Plaintiff continued to use self-catheters and pull-ups.  Oxybutynin was continued.  Requests for an increase in pull-ups were denied.  (ECF No. 109-10 at 48-49).

At some point prior to his medical clinic visit on August 30, 2018, a contraband check found Plaintiff to have been hoarding his pull-ups and catheters as contraband.  Specifically:

> Routine contraband round-up found the patient to have 4 boxes of I/0 catheters that inmates were using as straws and 8 packages (160 pull-ups) of pull-ups showing that the patient has not been using his supplies in any way close to how much he stated he was needing them.

(ECF No. 109-10 at 52).  The Medical Defendants have provided a photo of the large contraband pile.  (ECF No. 109-13).  Plaintiff's catheters and pull-ups were reduced to one per day to reflect his actual use.  (*Id*. at 53).  On October 16, 2018, the catheters were increased to four times per

---

[16] A drug used for overactive bladder.  Available at www.pdr.net (last accessed June 9, 2022).

day at the recommendation of urology, and pull-ups were continued. (ECF No. 109-10 at 55). Pull-ups were increased to 21 per week on November 7, 2018. (ECF No. 109-10 at 57).

On January 9, 2019, notes indicate that Plaintiff was sent to UAMS for another urodynamic study, but he refused the test because he was "doing better." (ECF No. 109-10 at 60). Plaintiff asked for a plastic cover for his mat. A new mat was ordered. (*Id*. at 61). On January 16, 2019, Plaintiff first asked for additional supplies for his incontinence such as bed pads, sheets, blankets, and trash bags. (ECF No. 109-10 at 63). Plaintiff was given an extra blanket, but the rest was denied as not medically necessary. (*Id*.). On January 28, 2019, Plaintiff's requests were again denied, stating they were following the recommendations from urology. (*Id*. at 64). A urology follow-up and another urodynamic study were ordered. (*Id*.). Plaintiff continued to request additional supplies. (ECF No. 109-10 at 65-68). On April 3, 2019, Plaintiff was seen by Dr. Breving. He was diagnosed with an enlarged prostate. Dr. Breving recommended a surgical procedure called a "Button Turp,"[17] which Plaintiff refused. Another urodynamic study was suggested with Dr. Lai. (*Id*. at 68).

After the exam with Dr. Breving, Plaintiff's demands for additional incontinence supplies abruptly ceased. On July 29, 2019, the following comment was entered:

> Patient was switched from Perphenazine to Loxapine. After Dr. Breving suggested Dr. Lai, needs a Turp, the patient reported that the bed wetting has stopped. He is no longer self cathing. He believes this is secondary to the med change.

(ECF No. 109-10 at 74). Plaintiff continued to be provided with pull-ups and catheters, and urology consults were scheduled. (*Id*.). Medical records after this focus largely on Plaintiff's complaints of gastrointestinal and other issues, with only the occasional comment concerning urinary frequency as opposed to incontinence. (ECF No. 109-10 at 75-99). A comment by Dr.

---

[17] A Button TURP, also called bipolar cautery vaporization, used low temperature plasma energy to remove excess prostate tissue. Available at www.healthline.com (last accessed June 9, 2022).

Vowell on October 29, 2019, indicates Plaintiff has "no significant medical issues – more somatic/psychiatric issues." (ECF No. 109-10 at 83). A chronic care summary on April 23, 2020, states: "Patient has been seen for 8 provider sick calls, 26 nurse sick calls, and 6 outside consults since his last chronic care visit late October 2019." (ECF No 109-10 at 91).

The Medical Defendants provided an affidavit from Dr. Chris Horan, the Regional Medical Director for WellPath, LLC. (ECF No. 109-16). He states that pull-ups are sufficient to absorb the amount of urine normally held in the bladder. In his 18 years as the director of a nursing home, where urinary incontinence is often an issue, it is his experience that pull-ups are effective, and additional pads and other items are unnecessary. (*Id*. at 3).

Plaintiff does not directly dispute any statements or arguments by the Medical Defendants in his Response for this Claim. Instead, he summarizes the complaints in the grievances listed above for this claim. (ECF No. 116 at 15). Plaintiff addresses Dr. Horan's testimony by arguing for the first time in this case that:

> on 12/15/21, I learned by reading Lange Current Medical Diagnosis and Treatment that even if you use a catheter just prior to going to bed, "peripheral edema can cause the overwhelming production of urine when previously dependent legs assume the horizontal position." At the same time I was wetting the bed, I was being treated for pitting edema in my legs.

(ECF No. 116-1 at 5) (emphasis removed). Plaintiff does not provide document cites or dates to support this claim. Mention of "minimal" and "mild" edema occurs in the medical record starting April 10, 2018. (ECF No. 109-10 at 43). On April 24, 2019, Plaintiff was prescribed Ted hose for swelling of his lower extremities. (ECF No. 109-10 at 69). These dates do not coincide with either his allegations of when bed-wetting began or when he began asking for additional incontinence supplies.

In his Declaration, Plaintiff blames his bed-wetting on the drug Perphenazine, stating that he stopped bed-wetting two days after he stopped taking it and has not wet the bed "one-time" since. (ECF No. 116-1 at 9). He also states the drug caused the bed-wetting by causing him to have "ED and deep sleep." (*Id*.). Plaintiff's psychiatric records indicate that Plaintiff requested and received Perphenazine starting on March 2, 2016. (ECF No. 109-14 at 27). This pre-dates any of his complaints of bed-wetting by more than a year. In their Reply, the Medical Defendants also point out that Plaintiff simultaneously complains of ongoing insomnia for Claim One, but of a Perphenazine-induced sleep so deep that it caused bed-wetting in Claims Two and Three. (ECF No. 117 at 10).

Thus, the summary judgment record blatantly contradicts Plaintiff's allegation that Dr. Daniel or any other medical provider was deliberately indifferent to his medical needs by denying him additional incontinence supplies. Instead, the record reflects that Plaintiff was seen frequently by medical providers, testing and medications were prescribed, UAMS urology consults were arranged, and he was given catheters and pull-ups. It was then discovered that Plaintiff was hoarding those supplies and sharing them with other inmates, some of whom used the catheters as straws. The number of catheters and pull-ups was reduced, and then later increased pursuant the recommendation of the next urology consult, and Plaintiff's treatment continued to be guided by the recommendations of UAMS urologists.

There is no genuine issue of material fact in this claim, and the Medical Defendants are entitled to summary judgment as a matter of law.

### 4.      Claim Five – Dental Care

For Claim Five**,** Plaintiff alleges Dr. Davis and Dr. Talliaferro (the "Dental Defendants") have provided him with inadequate and untimely dental care starting in November 2016. (ECF

No. 9 at 11).  Plaintiff alleges that delays in dental care have resulted in the loss of teeth that could have been saved if he had been seen in a timely manner.  He alleges the delays have also caused severe pain and suffering.  Further, when more than one repair is needed, only one repair is made, then the other repair is moved to the bottom of the repair list.  Plaintiff alleges he has been required to have teeth extracted before others would be filled and has waited for nearly one and a half years to have two teeth filled.  He was recently told that one tooth must now be extracted due to the delay.  Plaintiff further alleges that Dr. Talliaferro is physically incapable of performing his job because his hands shake.  Teeth filled by Talliaferro have needed to be extracted, and he left pieces of tooth in Plaintiff's jaw after an extraction.  Plaintiff then needed to undergo dental surgery where his jawbone was shaved, and the leftover parts of teeth removed.  Plaintiff states he just needs the pain to stop, and that it currently hurts to chew soft noodles.  (*Id*. at 12).  Plaintiff alleges that Wellpath has a custom of delaying dental care so that inmates will choose extractions, which are provided in a timelier manner than other dental work, and of moving additional repairs to the bottom of the repair list.  (*Id*.).

Dental Defendants indicate Plaintiff testified that he filed five grievances concerning Dr. Davis and Dr. Talliaferro, but two of them concern periods of time more than three years prior to this case, and as such are irrelevant.[18]  (ECF No. 110 at 19).  They state Plaintiff grieved a delay in treatment for tooth 18 in OR-17-00901.  (*Id*. at 18-19).  They state Plaintiff was examined by Dr. Davis on May 15, 2017, for a requested filling on Plaintiff's right side.  Dr. Davis believed fillings for teeth 31 and 32 (lower left side) were more urgent and filled them instead.  Because dentists typically do not perform work on opposite sides of the mouth at the same time, Plaintiff was placed back on the list for fillings.  Teeth 18 and 19 were filled on July 27, 2017.  (*Id*.).

---

[18] Further, neither OR-16-01826 nor OR-17-00616 name Dr. Davis or Dr. Taliaferro.  (ECF No. 109-5).  As a result, these grievances were not exhausted against either of them under ADC grievance policy.

In OR-19-00689,[19] Defendants indicate Plaintiff grieved that he had pain chewing "where bone spurs were removed several weeks ago.  Plaintiff was examined by Dr. Davis on April 15, 2019, and 500 milligrams of ibuprofen twice a day was prescribed.  (*Id*. at 19).  Decay in tooth 19 was noted and it was "non-restorable."  (*Id*.).  Tooth 18 was also noted to have decay and was "non-restorable."  There was no infection or swelling, and Plaintiff was noted to have an extremely dry mouth with signs of thrush.  A "Nystatin suspension and Biotene mouthwash" were prescribed.[20]  (*Id*.).  Plaintiff was already on the extraction list for those teeth.  (*Id*.).  Dr. Taliaferro extracted teeth 17 and 18 on May 28, 2019.  Plaintiff was prescribed painkillers, and antibiotics after the extraction.  (*Id*. at 20).  On June 4, 2019, Plaintiff was seen for a complaint of something sharp protruding on his tongue.  (*Id*.).  Dr. Taliaferro prescribed more painkillers, Ensure, and antibiotics, and scheduled Plaintiff for an alveoplasty at the extraction site of tooth 18.  (*Id*.).  Dr. Taliaferro performed the alveoplasty and bone spur removal for the tooth 18 site on June 13, 2019.  Painkillers, antibiotics, and Ensure were prescribed.  (*Id*.).  On June 25, 2019, Plaintiff complained of sensitivity in tooth 31 when eating sweets.  (*Id*.).  Decay was noted, but no swelling or infection was present.  Tooth 31 was filled on August 19, 2019.  (*Id*.).

Dental Defendants provided an affidavit from Dr. Stringfellow, the Regional Dental Director for WellPath, which provided detail and clarification to Plaintiff's dental care, and opined as to the quality of the care.  In his opinion, Plaintiff's dental care was appropriate and satisfactory for his complaints during the relevant period.  (ECF No. 109-17).

---

[19] Defendants do not reference the contents of Grievance OR-19-00733.  It appears this Grievance was filed on July 4, 2019, but it does not appear to have been exhausted based on the documents in the summary judgment record.  Plaintiff complains of a delay in filling a tooth.  (ECF No. 109-5 at 96-97).

[20] Nystatin oral suspension is used to treat fungal and yeast infections in the mouth.  Available at rxlist.com (last accessed June 23, 2022).  Biotene is a saliva substitute used to treat dry mouth.  (Available at drugs.com (last accessed June 23, 2022).

In his Response and Declaration, Plaintiff does not dispute the content or number of grievances, or the summary of his dental care provided by the Dental Defendants. (ECF Nos. 116 at 15-16; 116-1 at 15-16). Instead, he brings up a new claim that he is still awaiting a partial for his lower jaw. (*Id.*).

Thus, the summary judgment record contradicts Plaintiff's claim that the Dental Defendants were deliberately indifferent to Plaintiff's dental needs. Instead, the summary judgment record indicates Plaintiff was seen and treated multiple times for dental complaints. This treatment included pain medication, antibiotics, dental rinses for oral fungal and yeast conditions and dry mouth, Ensure, amalgam fillings, tooth extractions, and oral surgery. Plaintiff does not dispute he received this treatment. Dr. Stringfellow reviewed the treatment and found it to be appropriate.

Plaintiff's primary complaint appears to be that his dental exams and treatments were not provided as quickly as he would prefer. However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis.'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted). "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997).

Here, the summary judgment record shows that Plaintiff has been provided with dental care and there is no objective evidence of any unreasonable delay in providing that dental care. Additionally, Plaintiff has failed to provide any verifying medical evidence showing that any alleged delay in dental treatment negatively affected his prognosis.  Finally, Defendants have provided a dentist's affidavit indicating that the dental care provided was appropriate and satisfactory.

There is no question of material fact in dispute for this claim, and the Dental Defendants are entitled to summary judgment as a matter of law.

### 5.      Claim Eleven – Foot Pain

For Claim Eleven**,** Plaintiff alleges Nurse Parsons denied him medical care for foot pain on June 13, 2019.  (ECF No. 9 at 14).  He alleges she refused to acknowledge that his toe was swollen, refused to provide any care, and delayed his appointment with a podiatrist.  He was seen by a podiatrist on August 20, 2019, at which time the specialist diagnosed him with torn ligaments "within 1 minute" of seeing him, and prescribed surgery.  Plaintiff underwent surgery on October 31, 2019.  (*Id*. at 14-15).  He alleges Nurse Parsons regularly ignores his medical complaints. Plaintiff proceeds against this Nurse Parsons in her personal capacity.  (*Id*. at 14).

Medical Defendants note that Plaintiff testified he filed one grievance concerning this claim: OR-19-01088.  (ECF No. 110 at 24).  The final grievance response states that Plaintiff was seen by Dr. Gauldin on August 20, 2019, who noted "surgical planning."  (ECF No. 109-5 at 167). A consult was placed, but it was rescheduled due to transportation issues.  Plaintiff underwent surgery with Dr. Gauldin on October 31, 2019.  (*Id*.).

A review of the medical record indicates Plaintiff was seen on May 30, 2019, requesting uric acid test results for foot pain.  (ECF No. 109-10 at 70).  The uric acid test was slightly elevated,

and a new drug prescribed. (*Id*. at 71). He was seen again on June 24, 2019, complaining that his toe and foot were worse. (*Id*.). His toe was x-rayed, taped for support, and he was given pain medication. (*Id*. at 72). On July 29, 2019, he again complained of foot pain and reported the taping and pain medication did not help. Notes indicated the prior x-ray was normal. (*Id*. at 73). A podiatry consult was ordered. (*Id*. at 73-74). Plaintiff saw the podiatrist on August 20, 2019. (*Id*. at 77). On August 28, 2019, Dr. Gauldin diagnosed him with a hammertoe on the right and a dislocation at "MTP1 2nd Right foot." He suggested surgical planning to "repair plantar plate and hammer toe." (*Id*. at 78). Plaintiff had surgery on October 31, 2019. (*Id*. at 83).

The Medical Defendants provided an affidavit from Dr. Chris Horan, stating that Plaintiff's condition was not emergent, and he was provided with appropriate pain medication and appropriate medical restrictions. (ECF No. 109-16 at 4-5). He further states there was no adverse effect to Plaintiff's prognosis resulting from the short delay in scheduling the surgery. (*Id*. at 5).

In his Response, Plaintiff does not dispute the facts in the medical record, and he does not state he suffered any adverse effect to his foot prognosis due to the delay in receiving surgery. (ECF No. 116 at 17-18). He does not address this claim in his Declaration.

Thus, the summary judgment record contradicts Plaintiff's allegation that Nurse Parsons was deliberately indifferent in her treatment of Plaintiff's foot pain. Plaintiff was seen for a painful foot, was provided with appropriate pain medication, received a podiatry consult for the foot, and underwent surgery to correct the issue, all within several months of his first complaint for this issue. Plaintiff makes no allegations that the prognosis for his foot was negatively affected by any delay in seeing the podiatrist.

There is no question of material fact on this claim, and Nurse Parsons is entitled to summary judgment as a matter of law.

## IV.      CONCLUSION

Overall, the summary judgment record before the Court indicates that Plaintiff was seen very frequently by psychiatric, medical, and dental providers for a multitude of ever-shifting, inconsistent, and at times mutually incompatible complaints of distress.  The summary judgment record contains over 550 pages of medical, dental, and psychiatric records.  Multiple medications and supplies have been frequently reviewed, discussed, and adjusted, with every indication that the medical providers were exercising their independent medical judgment.  Plaintiff has been seen for outside consults with urologists, podiatrists, gastroenterologists, neurologists, and oral surgeons.  He has received surgery when it was recommended.  He has been given mental assessment instruments, urodynamic studies, a colonoscopy, and had countless other labs and tests performed – often at his request.

Based on this summary judgment record, the Court concludes the care Plaintiff received was constitutionally sufficient.  Courts "hesitate to find an [E]ighth [A]mendment violation when a prison inmate has received medical care." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).  *See also, e.g., Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (Eighth Amendment does not require that prisoners receive "unqualified access to health care"); *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991) (it is not constitutionally required that care be "perfect, the best obtainable, or even very good") (citation omitted); *Schaub v. VonWald*, 638 F.3d 905, 935 (8th Cir. 2011) (Beam, J., dissenting) ("inmates are only entitled to adequate medical care, not the best care possible") (internal quotation marks and citation omitted).

While Plaintiff disagrees vehemently and volubly with the quality of care provided, such disagreement does not state a constitutional violation.  The Eighth Circuit has "repeatedly held that a prisoner's mere difference of opinion over matters of expert medical judgment or a course

of medical treatment fail to rise to the level of a constitutional violation." *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's disagreements on location of rehabilitation for burn injuries, amounts of pain medication, and frequency of bandage changes failed to state deliberate indifference); *Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir. 1989) (prisoner's disagreement about treatment for mental deficiency, surgery for hernia, hearing deficiency, and nutritional deficiency found insufficient); *Lair v. Ogelsby*, 859 F.2d 605, 606 (8th Cir. 1988) (mere disagreement about which medication should have been prescribed does not constitute an Eighth Amendment violation); *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985) (prisoner's disagreement about treatment of pain in his lower back and arm did not constitute an Eighth Amendment violation).

Accordingly, it is recommended that the Motions for Summary Judgment by Defendant Alford (ECF No. 93) and the Medical Defendants (all remaining Defendants) (ECF No. 108) be **GRANTED**, and that Plaintiff's Amended Complaint (ECF No. 9) be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 24th day of June 2022.

/s/ *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE